1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**FRESNO DIVISION**

| | |
|---|---|
| JOSE DAVID ROMERO, | Civil No.  1:06-1866 JLS (JMA) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| vs. | |
| JAMES E. TILTON, et al., | |
| Respondents. | |

18 I.     **INTRODUCTION**

19       Jose David Romero, a state prisoner proceeding *pro se* and *in forma pauperis*, has filed an

20 Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging his Fresno

21 County Superior Court conviction for first-degree murder [doc. no. 10].   Romero claims: (1)

22 prosecutorial misconduct; (2) error by the trial court in improperly instructing the jury and dismissing

23 a robbery count; and  (3) ineffective assistance of trial counsel.  (Amended Petition ("Am. Pet.") at

24 5-6.)   Romero also requests an evidentiary hearing.  (*Id*. at 5.)   Respondent asserts Romero's

25 prosecutorial misconduct claim is procedurally barred and that his other claims are without merit.

26 (Respondent's Answer at 2.)

27       The Court has considered the Amended Petition (Am. Pet.), Respondent's Answer and

28 Memorandum of Points and Authorities (Resp'ts. Mem.), Petitioner's Traverse and Memorandum of

Points and Authorities (Traverse), and all the supporting documents submitted by the parties. Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court orders Romero's request for a hearing and the Amended Petition be **DENIED**.

## II.    <u>FACTUAL BACKGROUND</u>

This Court gives deference to state court findings of fact and presumes them to be correct. 28 U.S.C. § 2254(e)(1)(West 2007); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness). The facts as found by the state appellate court are as follows:

> Nineteen-year-old [Donald "DJ"] Hunter owned a pick-up truck. He added special equipment to his truck and the vehicle was known around town. On the evening of March 21, 2002, Hunter left his home and drove in his truck to the home of his friend Carlos Rodriguez. He and Rodriguez went out to dinner. Hunter had $5 with him. They returned to Rodriguez's house and remained there until approximately 1 a.m. Hunter left and said he was going home.
>
> Paul Bedrosian knew Hunter and was familiar with the truck that he drove. Bedrosian saw him alone in the vehicle driving his truck in the direction of his (Hunter's) home at approximately 1:15 a.m. on March 22, 2002.
>
> [Ramiro] Roman was at his home on the evening of March 21, 2002. His friend [Alfred] Cruz was at Roman's home "kicking back." As Roman was getting ready to leave to walk over to get his girlfriend Delores (Cruz's sister), Stacy Dyer walked up, asked for Roman, and said that "Chuey" (Jesus Lopez) wanted to see him.
>
> After Roman called to Cruz, the two went outside and saw Lopez standing next to a truck. Roman asked Lopez where he got the truck. Lopez said he "jacked" the truck and the victim was being held in the bed of the truck under the truck bed cover.
>
> [] A light blue van [arrived on the scene] with four additional individuals. The four people were defendant [Jose Romero], Daniel Ortega (Dyer's boyfriend), [Martin] Castro, and another male. [] Ortega, Dyer, and the other male got into the truck. Defendant, Lopez and Castro drove off in the van.
>
> Juan Hernandez lives in rural southwest Fresno. He usually leaves for work between 4 and 5 a.m. On the morning of March 22, 2002, after leaving for work, he saw a van stopped at a stop sign. The van was followed by a very nice Chevrolet truck.
>
> Harry Stackhouse also lives in rural southwest Fresno. On the morning of March 22, 2002 he heard several gunshots. Seconds later, he saw a blue van speed away. He then saw smoke. Another neighbor

1:06cv1866

also reported hearing gunshots and seeing smoke. His wife called law enforcement. The smoke was not unusual because cars are frequently dumped and burned in the area.

Deputy Sheriff David Cunha received a call at 5:30 a.m. of a burning vehicle at Muscat and West in Fresno County. He arrived at the scene and found a burning truck. There was a burned human body in the bed of the truck. The victim, Hunter, had been shot three times in the head. The cause of death was perforation of the brain by multiple gunshots. The burns on the body were post mortem.

[] Roman saw the defendant with [Alfred] Cruz's brother, Robert, at Kmart. Roman asked what had happened. Defendant said that Dyer had killed Hunter. Defendant said that he, Lopez, and Castro, waited in the truck. He also said that Hunter had been killed and then burned. Robert Cruz had the amplifier [stolen from Hunter's truck] that he had purchased from his brother. He gave the amplifier to law enforcement when they spoke to him.

Law enforcement conducted interviews and issued warrants. The speakers and one of the amplifiers were found in the basement of Roman's home. The serial numbers and/or brand and model numbers on the stereo equipment found in the basement matched the stereo equipment boxes retrieved from Hunter's home.

[] Defendant [Romero] was one of the last individuals arrested. He was questioned by authorities. At first he denied knowing anything about the murder. He also denied having a conversation with Robert Cruz at Kmart. Eventually, he acknowledged that he spoke to someone at Kmart and then said that he was at the murder scene. He claimed that he rode in the blue van with Ortega to the house of his uncle (Lopez). Ortega was paged by Dyer. They followed the truck to the country. He got out of the truck and was instructed to be a lookout. He then got back in the van. When he got in the van there were three rims from the truck in the van. He heard gunshots and then Dyer got in the van. The truck was on fire and Dyer had a gun in her hands. While acknowledging that he was present at the scene, he denied knowing what was going on--in particular he denied knowing that someone was going to be murdered.

Alfred Cruz testified on his own behalf before he entered his guilty plea. He admitted taking items from Hunter's truck, but denied going to the murder scene. Cruz testified that the defendant got out of the van at Roman's house. He testified that defendant said to him that they were going to tie up the victim and take off the rims. Cruz said he was not going to go with the group and the defendant said "you're a little bitch."

(Lodgment No. 4 at 2-6.)

## III.   PROCEDURAL BACKGROUND

Seven individuals were prosecuted for the murder of Donald "DJ" Hunter. (Lodgment No. 4 at 2.) On February 19, 2003, the Fresno County District Attorney's Office filed a criminal complaint

3

charging Jose Romero, Alfred Cruz, and Martin Castro with murder while engaged in, or accomplice to, a robbery, kidnapping, and car-jacking in count one, and second degree burglary in count two. (1 Clerk's Transcript ("CT") at 003.) Cruz pled guilty to one count of robbery at the close of evidence in return for his testimony at the upcoming murder trial of Dyer, Ortega, and Lopez. (Lodgment No. 4 at 2.) Upon the state's request, the court dismissed the robbery count against the remaining defendants. ( Reporter's Transcript ("RT") at 2221-22.)

Romero and Castro were found guilty of first-degree felony murder. (3 CT at 774-75.) On March 30, 2004, the court sentenced Romero to 25 years to life in prison but continued the matter for possible reconsideration of sentence. (4 CT at 907-09.) On May 19, 2004, the court affirmed Romero's prison sentence. (4 CT at 913.) On May 21, 2004, Romero filed a notice of appeal. (4 CT at 910-11.) The Fifth Appellate District of the Court of Appeal denied Romero's appeal on November 29, 2005. (Lodgment No. 4.) Romero filed a Petition for Review on January 22, 2006, and a Petition for Writ of Habeas Corpus in state court on January 26, 2006. (Lodgment Nos. 6 and 8.) The California Supreme Court denied both petitions on February 22, 2006. (*Id.*)

Romero filed his federal Petition for Writ of Habeas Corpus in the United States District Court for the Eastern District of California on December 22, 2006 [doc. no. 1]. He was given leave to file an Amended Petition [doc. no. 7]. Romero filed his Amended Petition on February 6, 2008 [doc. no. 10]. Respondent filed an Answer on August 18, 2008 [doc. no. 14]. Romero filed his Traverse on October 20, 2008 [doc. no. 21].

On November 25, 2008, this case was reassigned to the Honorable Janis L. Sammartino as visiting judge from the Southern District of California [doc. no. 22].

IV. **SCOPE OF REVIEW**

Title 28, United States Code, § 2254(d), sets forth the following scope of review for federal habeas corpus claims:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was *adjudicated on the merits* in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2) (West 2006) (emphasis added).

To obtain federal habeas relief as to claims that have been adjudicated in the state courts on their merits, Williams must satisfy either § 2254(d)(1) or § 2254(d)(2). *See Williams v. Taylor*, 529 U.S. 362, 403 (2000). The Supreme Court interprets § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle
> from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 529 U.S. at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *Early v. Packer*, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.*

## V.  PROSECUTORIAL MISCONDUCT AND PROCEDURAL DEFAULT

Romero claims two instances of prosecutorial misconduct deprived him of his constitutional right to a fair trial. (Am. Pet. at 5; Traverse at section V, Claim One.) [1] First, he states the prosecutor

---

[1] The pages of Romero's Traverse are not consistently numbered, hence the use of section numbers for some references and page numbers for others, depending on ease of use.

prejudicially manipulated the timeline of events at the final crime scene; and second, he argues the prosecutor implied a witness was scared to testify against him. (*Id.*) Romero raised these claims on direct appeal. (Lodgment No. 1 at 55-63.) The California Court of Appeal held the claims were waived because Romero failed to object to the prosecutor's alleged misconduct at trial, thus failing to preserve the issues for appellate review. (*See* Lodgment 4 at 13.) Accordingly, Respondent now asserts Romero's claims are procedurally defaulted and barred from habeas corpus review . (Resp'ts. Mem. at 8-10.)

### A.    Procedural default as affirmative defense

Procedural default is an affirmative defense and Respondent must first plead and prove the existence of an independent and adequate state procedural ground for the default. *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003). Respondent asserts California's contemporaneous objection rule is an independent and adequate state procedural ground. Ninth circuit law supports this assertion. *See Garrison v. McCarthy*, 653 F.2d 374, 377 (9th Cir. 1982) (California courts adhere to contemporaneous objection rule barring review of claims not previously raised at trial); *Rich v. Calderon*, 187 F.3d 1064, 1069-70 (9th Cir. 1999) (prosecutorial misconduct claim procedurally defaulted on habeas review based on violation of contemporaneous objection rule by petitioner); *Melendez v. Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002) (contemporaneous objection rule found under section 353 of California's Evidence Code is independent, and is adequate only when a party has failed to make any objection at all to admission of evidence (as opposed to when objection has been made but not addressed on merits by trial court)).

By identifying the claims that are allegedly procedurally barred and applying the relevant legal principles, Respondent has adequately pled and proved its affirmative defense of state procedural default. *See Dennis v. Brown,* 361 F.Supp.2d 1124, 1129 (N.D. Cal. Mar. 10, 2005) (respondent's identification of each of petitioner's claims as procedurally defaulted in a motion to dismiss was sufficient to meet burden); (Resp'ts. Mem. at 8-10).

//

//

//

B.    <u>Cause and prejudice and fundamental miscarriage of justice exceptions to procedural</u>
<u>default</u>

Romero does not contend that California's contemporaneous objection rule is not independent or adequate.   Instead, he claims his case meets the "cause and prejudice" and "fundamental miscarriage of justice" exceptions to procedural default.  (Traverse at section III.)  A federal habeas court may review a petitioner's defaulted claims if the petitioner "can demonstrate *cause* for the default and *prejudice* as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a *fundamental miscarriage of justice*."  *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991), quoting *Murray v. Carrier*, 477 U.S. 478, 485 (1986) (emphasis added); *see also High v. Ignacio*, 408 F.3d 585, 590 (9th Cir. 2005).

Cause for procedural default requires an objective factor external to the defense that impeded the petitioner's efforts to comply with the procedural rule.  *See Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Acceptable objective factors include interference by officials that makes assertion of the claim impracticable, a showing that the factual or legal basis for the claim was not reasonably available, or constitutionally ineffective assistance of counsel under the Sixth Amendment. *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).  Romero's prosecutorial misconduct claim was reasonably and practicably available to him at trial.  However, he claims his trial counsel was ineffective for failing to raise the claim.  (Am. Pet. at 5; Traverse at section V, Claim One.)  As the Court concludes below in section VII, trial counsel was not ineffective in this regard.  In the absence of a meritorious ineffectiveness claim, Romero cannot show cause to excuse the procedural default and the Court need not consider whether he suffered actual prejudice. *Cook v. Schriro*, 538 F.3d 1000, 1028 n.13 (9th Cir. 2008) citing *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982).

Nevertheless, "[e]ven if a state prisoner cannot meet the cause and prejudice standard, a federal court may hear the merits of [a defaulted claim] if the failure to hear the claim[s] would constitute a 'miscarriage of justice'." *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992).  This exception only applies to the "extraordinary case, where the constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496; *see also Schlup v. Delo*, 513 U.S. 298, 314-15 (1995) (claim of innocence is procedural not substantive because it functions to bring

petitioner within "narrow class of cases" where defaulted claims will nevertheless be heard on fundamental miscarriage of justice grounds). To come within this exception, "a petitioner must show that, in light of all the evidence, including evidence not introduced at trial, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Johnson v. Knowles*, 541 F.3d 933, 937 (9th Cir. 2008) (citing *Majoy v. Roe*, 296 F.3d 770, 776 (2002) (internal quotation marks, citations omitted)).

C.   Is it more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt?

In order to find Romero guilty of felony murder, the jury had to find that he formed the specific intent to kidnap, rob, or carjack Hunter. *See* 3 CT at 819-23; CALJIC 8.27, 9.40, 9.46, 9.50; *Clark v. Brown*, 450 F.3d 898, 914 (9th Cir. 2006) (under California law, when homicide occurs during commission of an enumerated felony, a defendant may be convicted of felony murder when defendant does not do the killing but is involved in the commission of the felony).

(1)   Romero's defense theory

Romero argues he did not form the intent to commit a felony *against another person*. He maintains that he was at all times unaware of the victim's presence in the back of the truck under the hood. He claims he acted as a lookout at the final crime scene, about 100 yards away from the main action, doing what he was told and not knowing the extent of what was happening. (Am. Pet. at 5-6; Traverse at section V, Claim One.) At most, he argues, he was guilty of theft from a vehicle. (*Id*.)

(2)   The evidence before the jury

Romero did not testify at trial. However, police officer Sergio Toscano testified extensively about the police interview he conducted with Romero. Initially, Romero told Toscano that he knew nothing about the murder. (4 RT at 849). Later he said he knew something about it from the papers and people on the street. (*Id*. at 859.) He also initially stated he did not recognize a picture of Stacy Dyer. (*Id.* at 897.) Eventually, Romero admitted to being at the scene of the crime and also to seeing Dyer. (4 RT at 880-81; 890.) He said he was picked up in the blue van by Daniel Ortega and Jesus Lopez, that they went to meet Dyer, that she was driving a truck and they followed her in the

van to a remote location. (4 RT at 891-95.) Romero stated that when they got to the location he was told to go to the corner of the street and be a look-out. (*Id.*) Officer Toscano said this did not make sense to him because the corner was a 100 yards away and was not a good look-out post since it was too far to give any warning. (*Id.* at 903.)

Romero told Toscano he did not know what was happening and that no sooner had he begun to be a lookout than he was called back and told to get in the van. (4 RT at 901-02.) Romero said he jumped in the van, saw that there were three rims in the back, and that Dyer was the only person left outside the van. (*Id.*) Romero then heard gunshots and saw Dyer get into the van with a gun in her hand. (*Id.*)

Toscano questioned Romero about incriminating statements he allegedly made to two individuals (later determined to be Robert Cruz and Ramiro Roman) at a K-Mart store, where Romero was reported to have spoken of the details of the crime, including that he (Romero) lit the match to start the fire. (4 RT at 868-69.) Romero initially denied this conversation about the murder had ever taken place. (*Id.* at 868.) However, he eventually admitted to it but denied saying he lit the match to set the truck and Hunter's body on fire. (*Id.* at 875-881.) He believed he had done nothing wrong with regard to Hunter's death. (*Id.*)

Romero's co-defendant, Alfred Cruz, testified on his own behalf, and stated that Romero was one of the individuals who rode in the blue van over to Roman's house. (5 RT 1022-23.) Cruz testified that Romero told him they were all going to tie up Hunter and take off the rims. (*Id.* at 1023-24.) When Cruz said he was not going with them, Romero allegedly told him, "you're a little bitch." (5 RT at 1024.) Cruz also testified that he overheard Lopez talking to someone called David (Romero appears to go by this name even though his first name is Jose) and saying, "dude's in the back of the truck." (*Id.* at 1024-25.)

Forensic pathologist, Venu Gopal, testified regarding the autopsy he performed on Hunter. (3 RT at 617-67.) Dr. Gopal's analysis of the entry and exit points of the bullets led him to the conclusion that Hunter's body must have been moved after the shooting and placed in the position in which it was found in the truck. This suggested that Dyer was not alone when she shot Hunter because she would have needed help to move the body back onto the truck, contrary to Romero's

9

statement to Toscano that she was the only one left outside the van when the gunshots were fired.

        (3)    <u>The timeline dispute and testimony--how long were the vehicles and defendants</u>
             <u>at the final crime scene?</u>

The "final crime scene" consists of the time period beginning with the arrival of the vehicles at the field out in the country, to the time spent stripping the rims off the truck, to directly before Hunter was shot and the truck set on fire. Romero claims the timeline began at approximately 5:45 a.m. and ended at approximately 6:00 a.m., with a lapse of only about 10-15 minutes. (Am. Pet. at 5-6; Traverse at section V, Claim One.) At trial, and in closing arguments, the prosecutor stated the timeline began between 4:35 a.m. and 4:43 a.m. and ended at approximately 5:50 a.m., reflecting a lapse of over an hour. (8 RT at 2308-09.) Romero states the prosecutor artificially extended the time to make it seem impossible that Romero could have remained ignorant of Hunter's presence during that time and to make his statements to police appear untruthful.

Romero alleges testimony elicited from Juan Hernandez reflects how the prosecutor intentionally manipulated the timeline. Hernandez testified he saw a van and an impressive truck stopped at the stoplight and traveling together as a unit shortly after he left for work. Romero's focus is on the time Hernandez stated he left for work that day:[2]

> Q. [Prosecutor] What kind of business were you employed in?
> A. Delivery business.
> Q. Is that a business that caused you to go to work at an early hour?
> A. Yeah, 4:00, 5 o'clock in the morning.
>
>         ***
>
> Q. [Prosecutor] Do you know what time you left for work on that date [day of crime]?
> A. Like 5:45 in the morning.
>
>         ***
>
> Q. When you passed that location [final scene of the crime] sometime after 4:45 you left [sic], did you see any burnt vehicle at that location?
> A. No.
> Q. Can you give us in just general terms how long it might have taken

---

[2] Romero argues that because Hernandez saw the truck and van around 5:45 a.m., without incident, Hernandez's testimony supported Romero's theory that they were only at the crime scene for approximately 10 minutes. In other words, when Hernandez saw the vehicles around 5:45 a.m., they were just arriving at the final crime scene and with the police discovering the burning truck at 6:00 a.m. the evidence supported a 10 minute lapse of time.

for you to drive from whatever location you left at 4:45 to arrive at that
location?
A. Five minutes.
Q. Five minutes?
A. Yeah.
Q. Or less?
A. Four to five minutes.
Q. Four to five minutes, okay.
I'm sorry?
A. I never count, but three to five minutes.
REPORTER: Counsel, you are saying 4:45.
THE COURT: I thought he said 5:45.
PROSECUTOR: He said four to five minutes.

(2 RT at 352-53.) Following this correction by the court and court reporter, the prosecutor wound up his questioning by stating the correct time; he asked Hernandez, "But you are sure there was no burnt truck there a few minutes after *5:45 a.m. when you left for work*." Hernandez stated, "No, there was nothing there." (*Id*. at 362.)

Harry Stackhouse testified that he normally wakes up between 4:30 and 5:00 a.m. and that on the day of the crime he heard three gunshots, maybe four, just after he woke up and then saw a blue van run a stop light. (2 RT at 365-83.) Stackhouse saw smoke coming from the direction of the shots. (2 RT at 372-74.) According to his police statement, Stackhouse had woken up at 5:45 on the day of the crime but on the stand Stackhouse believed the time was earlier than that. (*Id*. at 381-82.)

Vito Cassano testified he told his wife to call the police right after he heard gunshots and saw smoke just before 6:00 a.m. (4 RT at 700-02.)

Deputy David Cunha testified that he received a dispatch to go to the scene of a burning vehicle at 5:30 a.m. after initially implying the time was 5:53 a.m. (1 RT at 192-94.) Cunha stated it took him approximately eight minutes to "respond to the scene." (*Id.* at 194.)

(4)     Prosecutor's closing arguments and alleged misconduct

Romero claims that, during closing arguments, the prosecutor purposely misstated that Juan Hernandez saw the van and truck at approximately 4:40 a.m., that the van and truck arrived at the scene at approximately 4:43 a.m. and must have "stayed at that location until 5:50, at least, because at around 5:51, Vito Cassano, and his wife. . .called the sheriff's department." (8 RT at 2308-09.) Romero asserts the prosecutor's comments were unsupported by the evidence.

Romero also attributes misconduct to the prosecutor's statement that Robert Cruz was afraid

to testify, implying that Cruz would offer damning evidence against Romero and feared retaliation from Romero.  (Am. Pet. at 5; Traverse at 13.)

### (5)    No miscarriage of justice

At the very beginning of closing arguments, the prosecutor admitted that his presentation of the timeline may not be completely accurate.  The prosecutor told the jury the following:

> But I would want to say that the statements of counsel, just like in opening statement, is not evidence.  The statement of counsel about the evidence here at the end of trial is not evidence.  And maybe what I say about the evidence in this case will be accurate, maybe you disagree with some of the things I say about what the evidence has been.  But whatever the evidence has been, it is there.  You have heard it.  And the same thing applies to defense counsel. . ..  You know, they may make representations about what was shown in the evidence, about what the evidence was, about what statements were made and when they were made and the context in which they were made.  But all of that has been presented to you.  We're not offering anything new.  Okay.

(8 RT at 2262.)   The trial court also had cause to admonish the jury in this regard:

> Ladies and gentleman, I think I told you this at the very outset of the trial, but this is a time in which counsel are making statements and their statements are not evidence in this matter.  In closing argument, counsel are entitled to do two things.  They're entitled to argue to you what they think the evidence has shown and reasonable inferences they believe you should draw from the evidence.  Whether, in fact, the evidence has been what counsel argue will be up to you to decide in consideration of what you heard and whether the inferences that they ask you to draw are reasonable or not is, again, up for you to decide.

(*Id*. at 2296.)

The impact of the prosecutor's statements must be viewed in light of these comments to the jury that they were not to consider what he was saying as evidence but to rely on the evidence presented  throughout trial.  The statement by the prosecutor and admonition by the judge to the jury served to neutralize prejudice which may have resulted from the prosecutor's misstatements regarding the timeline. *See U.S. v. Parker*, 549 F.2d 1217, 1222 (9th Cir. 1977) ("Improprieties in counsel's arguments to the jury do not require a new trial unless they are so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge.")

With regard to the improper reference to Robert Cruz, Romero assigns a meaning to the prosecutor's statement that appears to be out of context.  Defense counsel, in closing argument,

asserted that Robert Cruz's statements to police implicating a knowing and active role by Romero in the felony murder were "baloney." (8 RT at 2334; 2352.) Defense counsel cast suspicion on why Robert had not been produced as a witness. (*Id.* at 2334.) The prosecutor stated the following in rebuttal:

> Well Robert Cruz wasn't necessary for a couple of reasons. One of them is that Jose David Romero admitted, ultimately, that he had that conversation at the K-Mart with Robert Cruz. Now, Robert Cruz, who knows he would be afraid to testify and he could be accused. You're damned if you do and damned if you don't. If I called him, I'm sure [defense counsel] with same vigor he was standing in front of you would say, what sort of prosecutor is this. He calls into this case a man, who, quite frankly, could have and maybe should have been arrested for receiving stolen property. It wasn't my judgment. I was not involved in the case then.

(8 RT at 2381.) The Court does not take this to imply that Robert Cruz was afraid of Romero but of being accused of a crime. The statement was an invited response to defense counsel's comments and not an extensive, improper tactic by counsel. *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993).

The prosecutor argued in closing that Romero must have known Hunter was in the back of the truck for several reasons. (8 RT at 2293-2315.) Alfred Cruz heard Lopez call Romero to tell him about Hunter. (*Id.*) Daniel Ortega who had arrived to pick up the truck with Romero said the plan was to torture Hunter and take him away, steal the rims and kill him. (*Id.* at 2295.) Further, according to Alfred Cruz, Romero told him Hunter was to be tied up and the rims of the truck tires were to be stolen. (*Id.* at 2293.) The prosecutor also questioned Romero's credibility by arguing that he was evasive and untruthful in his police interview with Toscano and that his statements that he was only at the crime a short time and that Dyer was the only one outside the van when he heard the gunshots did not make sense. (*Id.* at 2299-2302; 2311-2315.) Based on Dr. Gopal's testimony, the prosecutor theorized that Hunter had been shot outside the truck, which would have exposed his presence to everybody, and that multiple people would have had to help Dyer get Hunter's body back onto the truck, pour gasoline all over and light the fire. (*Id.* at 2312-2315.) The prosecutor further stated it would have taken some time to get the rims off the tires, and pour a gallon of gasoline (the official estimation) over the truck. (*Id.* at 2311.)

Defense counsel countered that Alfred, and his brother Robert, Cruz were "thick as thieves" and both had bias and motive to implicate Romero. (8 RT at 2332-72.) Counsel cast suspicion on

why Robert Cruz had not been produced as a witness and stressed that the prosecutor's case against Romero was so weak that the government cut a deal with Cruz to testify against Romero for a guilty plea to robbery. (*Id*.) Counsel emphasized that Romero had held fast in his denial of lighting the match or knowing that Hunter was in the truck (*Id*.)

"To be credible, [an actual innocence claim] requires petitioner to support his allegations of constitutional error with new reliable evidence [] that was not presented at trial." *See Schlup*, 513 U.S. at 324. Romero has not submitted any new evidence to support his misconduct claim in this Petition. The jury had the opportunity to weigh the evidence upon which Romero relies, against other evidence tending to show he knew about the presence of Hunter.

Viewing all the evidence as a whole, the Court cannot say it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt had the alleged instances of prosecutorial misconduct not occurred. *Johnson,* 541 F.3d at 933. Based on the above, the Court finds Romero has failed to show "actual innocence" and thus a miscarriage of justice exception to the procedural bar.

## VI.   **TRIAL COURT ERROR**

A.   Improper Jury Instructions

Romero claims the jury did not receive instructions crucial to his theory of defense. (Am. Pet. at 6; Traverse at 15-19.) He states that an instruction on theft should have been given to draw a clear distinction between robbery and the lesser offense of theft. (*Id*.) Romero also argues the jury should have specifically been instructed that he had to be aware of Hunter's presence in the truck or that he had to intend to commit a felony through force or fear. (*Id*.)

The Court of Appeal stated:

> We find the instructions as given were clear in setting forth the requirement that defendant must have the requisite knowledge and intent in order to be convicted of felony murder. We note that [] the addition of a theft instruction would not have added anything significant to what was already abundantly clear from the instructions given to the jury.

(Lodgement No. 4 at 17.)

14

To the extent Romero claims the jury instructions were incorrect under state law, his claim is not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). Further, as a general rule, in a non-capital case, such as Romero's, the failure of a state court to instruct on a lesser included offense does not present a federal constitutional question and will not be considered in a federal habeas corpus proceeding. *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); accord *Beck v. Alabama*, 447 U.S. 625, 637-38 (1980) (Court held failure to instruct on lesser included offense supported by evidence in capital case is constitutional error but declined to address whether this extended to non-capital cases). Nevertheless, "the criminal defendant is also entitled to adequate instructions on his or her theory of defense." *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984). Additionally, the Court may address Romero's constitutional right to have the jury find the existence of each element of a charged offense beyond a reasonable doubt. *Harmon v. Marshall*, 69 F.3d 963, 965 (9th Cir. 1995); citing *In re Winship*, 397 U.S. 358, 364 (1970).

To merit relief, Romero must show the omission of instructions so infected the entire trial that the resulting conviction violated due process. *Estelle,* 502 U.S. at 71-72. The significance of an omitted instruction should be evaluated by comparing it to the instructions that were given. *Id.* at 72. The following instructions were given to the jury:

> In the crime charged in Count One, Murder, there must exist a union or joint operation of act or conduct and *a certain specific intent in the mind of the perpetrator. Unless this specific intent exists the crime to which it relates is not committed.*

> The crime of Murder committed during the commission of a Robbery requires the *specific intent to commit a Robbery.*
> The crime of Murder committed during the commission of a Carjacking requires the *specific intent to commit a Carjacking.*
> The crime of Murder committed during the commission of a Kidnapping requires the *specific intent to commit a Kidnapping.*

(3 CT at 812; CALJIC 3.31.) (Emphasis added.)

\*\*\*

> The killing of a human being, whether intentional, unintentional or accidental, which occurs during the crime of robbery, or carjacking, or kidnap [sic] as a direct causal result of that crime is murder in the first degree *when the perpetrator had the specific intent to commit that*

15

*crime.*

> *The specific intent to commit robbery, or carjack, or kidnap, and the commission of that crime, must be proved beyond a reasonable doubt.*

(3 CT at 816; CALJIC 8.21.) (Emphasis added.)

The jury was further instructed on the elements of robbery, carjacking, and kidnapping, which included the requirements for *intent to commit those crimes* and *the presence of force or fear* and clearly that these were crimes *committed against another person.* (3 CT at 819-23.) The jury was also instructed on aiding and abetting and that the mere presence at the scene of a crime does not amount to aiding and abetting. (3 CT at 803.)

The Court of Appeal noted that defense counsel "emphasized and re-emphasized his theory of the case to the jury--that defendant did not have knowledge of Hunter's presence and did not intend to aid and abet the predicate felonies." (Lodgment No. 4 at 17.) Read and considered as a whole, the instructions framed the defense theory within the legal requirements for conviction by informing the jury that they could only find Romero guilty if he had the specific intent to commit one of the predicate crimes against Hunter by means of force or fear, beyond a reasonable doubt.

The Court of Appeal's determination that the lack of a theft instruction or the language of the instructions given did not result in the jury being deprived of finding all the elements required for conviction, was not contrary to or an unreasonable application of clearly established federal law. Romero's claim in this regard is **DENIED**.

B. Dismissal of Robbery Count

Romero was charged in the information with one count of first-degree murder, with three felony murder special circumstance allegations, and one count of second-degree robbery. (1 CT at 150.) The special circumstance allegations were robbery, kidnapping, and carjacking. (*Id.*) Upon the close of all evidence, and after co-defendant Alfred Cruz pled guilty to robbery, the court granted the prosecutor's request to dismiss the robbery count.

The Court of Appeal described the exchange over the dismissal thus:

> [Romero] claimed that the dismissal by the People would thwart the defense and asked that the robbery as well as a lesser included offense to robbery, remain in the case.

16

The prosecutor claimed that the defense had not been misled that the case proceeded on a robbery theory because robbery was alleged as one of the special circumstances and as a basis for the felony murder. He asserted that the felony murder was proceeding on a robbery, carjacking, and/or kidnapping theory and the jury may be confused because only robbery was charged as a separate offense.

The court commented that it had rejected giving instructions on the lesser included offenses of grand theft and vehicle theft for felony murder based on robbery because the lesser offenses were not felonies inherently dangerous to human life that could qualify as the basis for a second degree murder charge. The court did say it would instruct the jury on the lesser included offenses to the count charging only a robbery; but as it turned out, the jury received no such instruction because of the dismissal of the robbery count.

(Lodgment No. 4 at 6-7.)

Romero claims that the trial court's dismissal of the robbery count against him prior to closing arguments was an "ambush" of his theory of defense and violated his right to a fair trial. (Am. Pet. at 6; Traverse at 19-24.) As outlined previously, the evidence Romero provided at trial centered around his assertion that he was not necessarily innocent but at most only guilty of theft because he was unaware of the victim's presence. He argues, in the absence of the robbery count and an instruction on its lesser included offense of theft, the jury was left no choice but to convict of felony murder. (*Id.*) Romero also claims that by negating his theory of defense, the dismissal resulted in ineffective assistance of counsel.

The Court of Appeal decision stated the following:

The deprivation to defendant caused by the dismissal of the robbery count was that if the jury believed that defendant was not aware of Hunter's presence the jury had no available alternative except to acquit defendant. We find the lack of any alternative verdict was not prejudicial. [] Assuming that dismissal of the robbery count resulted in a deprivation of the lesser included theft offense instructions, any error was harmless. The jury necessarily resolved unfavorably the question of whether defendant had knowledge of Hunter's presence under the felony-murder instructions given.

Finally, we fail to see how the all-or-nothing choice given to the jury here affected the reliability of the verdict. Unlike cases where the jury might be tempted to enter a finding of guilt rather than acquitting a defendant because it believes that the defendant had significant involvement in a serious offense, yet did not meet all the requirements necessary for a finding of guilt to the only charge before the jury, the dichotomy here between murder and theft does not carry the same temptation. [] We can see no basis to assume that a jury believing that a defendant is guilty of only theft would behave so irrationally as to convict him of murder because it was loathe to acquit him and set him free.

Defendant has failed to demonstrate that error, if any, in

17

> dismissing the robbery count deprived him of fundamental fairness requiring reversal of his murder conviction.

(Lodgment No. 4 at 9-10.)

The Court has already determined the jury instructions as a whole were adequate. *See* Section VI (A). However, Romero claims the dismissal of the robbery count and its lesser-included theft counterpart rendered the jury's verdict unreliable because it was left with an "all-or-nothing" choice of either finding him guilty of felony murder or acquitting him completely in spite of his defense that he was not completely innocent. (Traverse at 19-25.) Nonetheless, the crux of Romero's argument was that he was unaware of Hunter's presence in the truck. Thus, the Court of Appeal concluded that because the instructions for felony murder required knowledge of a victim, they adequately served Romero's defense theory that he did not have that knowledge. (Lodgment No. 4 at 6-10.) Moreover, as noted by the Court of Appeal, Romero does not assert how he would otherwise have defended against the felony murder count, besides attempting to prove lack of knowledge of the victim. (*Id.*)

Even assuming the trial court erred in dismissing the robbery count, Romero would still need to prove he suffered "actual prejudice" to be granted relief. "A constitutional error discovered on habeas appeal requires reversal of the underlying conviction only if the error 'had substantial and injurious effect or influence in determining the jury's verdict'." *Bartlett v. Alameida*, 366 F.3d 1020, 1024 (9th Cir. 2004) citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (while grounded in the federal harmless-error rule, this substantial and injurious effect standard, requiring "actual prejudice," is better tailored to the nature and purpose of collateral review). To meet this standard, Romero must prove the jury convicted him of felony murder despite believing he was guilty only of theft. Romero argues his presentation of evidence at trial showed he was guilty of *some* crime and because of that, the jury would have found him guilty of the crime submitted to it rather than guilty of no crime at all. (Traverse at 19-25.)

The Court of Appeal rejected this logic, stating that the dichotomy between murder and theft was too great to reasonably conclude the jury was tempted to convict for murder if it thought Romero had only committed theft. (Lodgment No. 4 at 10.) To support its conclusion, the court cited the cases of *Beck* v. *Alabama*, 447 U.S. 625, and *Schad v. Arizona*, 501 U.S. 624 (1991). In *Beck* the Supreme Court held that an Alabama statute was unconstitutional because it prohibited lesser included offense instructions in a capital case, thus introducing the risk that the jury will convict simply to avoid setting

the defendant free; a level of unreliability that "cannot be tolerated in a capital case." *Beck*, 447 U.S. at 642.  In *Schad*, the Supreme Court further elucidated, "Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some *violent crime* but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all." *Schad*, 501 U.S. at 646 (emphasis added).  Although Romero's case does not involve a capital crime, the Court of Appeal used the reasoning behind the all-or-nothing analysis employed by the Supreme Court in these two cases to illustrate that lack of a theft count (not the type of violent crime mentioned in *Schad*) in this case would not have rendered the jury's verdict unreliable.

Considering: (1) the jury instructions were clear as to the requisite knowledge of a victim by the defendant; (2) the defense emphasized throughout trial that Romero was unaware there was a victim; and (3) the crime of theft compared to murder is non-violent and significantly less serious in nature, the Court concludes Romero has failed to show he suffered "actual prejudice" such that the absence of robbery and theft instructions had a substantial and injurious effect on the jury's verdict.

The Court of Appeal opinion was not contrary to or an unreasonable application of clearly established federal law.  Romero's claim is **DENIED**.

## VII.   INEFFECTIVE ASSISTANCE OF COUNSEL

Romero asserts several ineffective assistance of counsel claims.  He must show that his attorney's representation fell below an objective standard of reasonableness.  *Strickland v. Washington,* 466 U.S. 668, 688 (1984).  He must also prove he was prejudiced by demonstrating a reasonable probability that but for his counsel's errors, the result of the proceeding would have been different.  *Id.* at 694.  "Judicial scrutiny of counsel's performance must be highly deferential," and adopt a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy'." *Id.* at 689 (internal citation omitted).   A.   Failure to object to inadmissible hearsay evidence.

1     Romero argues trial counsel was ineffective for failing to object to improper hearsay evidence

2     during Deputy Toscano's testimony. (4 RT at 845-965.) Toscano's testimony contained details of

3     the police interview he conducted with Romero. (*Id.*) With regard to Roman's encounter with Robert

4     Cruz and Romero at K-Mart, Toscano testified that he stated the following to Romero during the

5     interview:

6               [B]oth of these people, ...-- the guy that works there, okay, and this
                other guy [one being Robert Cruz], they said that while you were
7               laughing and kind of joking about this [the murder] and it sounded kind
                of funny, but basically [you] said that Chuey poured the gas. . . .. [T]he
8               girl. . .shot the guy, okay, and not only shot the guy, but how many
                times the guy was shot, which nobody knew except for who was out
9               there, and that you lit the match. . .. And that's. . . coming from two
                different people, and we just. . . obtained that information.

10

11     (4 RT at 868-69.) Toscano also testified, "[w]e told the defendant that based on his own admissions

12     that he had made to others is what was getting him into trouble." (4 RT at 874.) During the interview,

13     Toscano suggested to Romero that "he had been picked out of a photo lineup," and "other people had

14     made statements implicating him." (4 RT at 882.) Romero argues admission of this impermissible

15     hearsay deprived him of his Sixth Amendment right to confront adverse witnesses.

16     The last reasoned state court decision addressing this issue is from the Court of Appeal. *Ylst,*

17     501 U.S. at 801-06. The court held the following:

18               [D]efense counsel had tactical reasons for failing to object.
                Defense counsel pointed out in his argument that the prosecution stated
19               it was going to have Robert Cruz testify as a witness, yet it failed to do
                so. He forcefully argued that Robert Cruz was "thick as thieves" with
20               the other more culpable defendants and argued that during his
                statement defendant always protested when Toscana inferred that
21               defendant had involvement in the murder and/or bragged about it to
                others, including the Kmart conversation. Defense counsel argued that
22               the Robert Cruz evidence was "baloney" and was offered to shore up
                a weak case against defendant by the prosecution.
23               The record demonstrates a multitude of tactical reasons for
                counsel's failure to object to the testimony and/or arguments now
24               complained of on appeal. His strategy was based on sound tactical
                decisions. Defendant has failed to show that there could simply not be
25               a satisfactory explanation for counsel's decision to not object to the
                errors now complained of on appeal.

26

27     (Lodgment 4 at 15-16.)

28     "Although the reasonableness of counsel's decision is best described as a question of law,

whether [counsel's] actions were indeed 'tactical' is a question of fact." *Edwards v. Lamarque*, 475

F.3d 1121, 1126 (9th Cir. 2007). Therefore, the Court must first determine if the state court made an

unreasonable determination of the facts in light of the evidence before it. *Taylor v. Maddox*, 366 F.3d

992, 999-1000 (9th Cir. 2004).

Romero's defense at trial was that he did not know Hunter was in the truck and he did not

intend to rob, carjack or kidnap Hunter. Defense counsel for Romero did not object to Toscano's

testimony and in fact elicited more portions of Toscano's interview with Romero upon cross-

examination. The evidence brought forth during this cross-examination was favorable to Romero's

case and highlighted the following about the police interview: (1) while admitting to several things

after initially being untruthful, Romero was adamant he did know of Hunter's presence until after the

shots were fired; (2) he was just a lookout and stood away from the action not really sure of what was

happening; (3) he had endured many hurdles in his life with an absent father and a mother in and out

of jail; (4) he essentially had a conscience and felt bad for the victim and the victim's family; (5)

although he admitted being at the scene he became very upset at the suggestion that he lit the match

to burn the truck and maintained that he did not do anything wrong; (6) Robert Cruz would have

purposely implicated Romero's involvement in the crime by fabricating the details of the K-Mart

conversation to protect others; and (7) Romero was initially reluctant to admit being at the scene

because he was scared to talk about the others involved. (4 RT at 907-17; 921-57.)

Considering Romero's theory of the case and the useful evidence elicited from Toscano in

support of that theory, it was not unreasonable for the Court of Appeal to determine that defense

counsel had a "strategy based on sound tactical decisions" for failing to object to Toscano's testimony.

Nor was the court's rejection of Romero's ineffectiveness claim contrary to or an unreasonable

application of established federal law. The court reviewed the circumstances at the time of counsel's

conduct and did not "second-guess" counsel's decisions. *Strickland,* 466 U.S. at 690; *LaGrand v.

Stewart*, 133 F.3d 1253, 1271 (9th Cir. 1998). This was in line with the deferential judicial scrutiny

to be accorded to counsel's performance. *Strickland,* 466 U.S. at 689. Moreover, although Romero

claims an automatic violation of his Confrontation Clause rights as a result of counsel's tactical

decision, the Confrontation Clause and the hearsay rule are not coextensive and "[t]he Clause does

not necessarily bar the admission of hearsay statements." *Swan v. Peterson*, 6 F.3d 1373, 1379 (9th Cir. 1993). Where defense counsel fails to object to hearsay portions of a piece of evidence that counsel also intends to tactically use for exculpatory purposes, there is no violation of the Confrontation Clause. *U.S. v. Peeper*, 685 F.2d 328, 329 (9th Cir. 1982).

Romero's claim is thus **DENIED**.

B. Failure to object to prosecutorial misconduct/perpetuation of misconduct

Romero argues his defense counsel was ineffective for failing to object to prosecutorial misconduct at the trial and that defense counsel actually perpetuated the misconduct. (Am. Pet. at 5; Traverse at Section V, Claim One.) As stated in section V above, Romero's claims of misconduct are that the prosecutor mischaracterized the timeline evidence and improperly implied in closing argument that Robert Cruz was not brought in to testify because he was scared of Romero. Defense counsel did not object to either of these alleged instances of misconduct and used a similar timeline in closing argument.

Romero highlights the prosecutor's misstatement of the time during direct examination of Juan Hernandez (portion of transcript in section V), and in closing argument. (*Id.*) Even after Hernandez stated he left for work at 5:45 a.m. the prosecutor kept referring to Hernandez leaving his house at 4:45 a.m., an hour earlier, supporting the prosecution's theory that defendants and Hunter were at the scene for over an hour during which time Romero had to have known that Hunter was in the truck. After the trial court and court reporter corrected the prosecutor, he ended his questioning by referring to the correct time of 5:45 a.m. However, during closing arguments the prosecutor reverted back to stating Hernandez left his house at 4:45 a.m. when presenting the timeline.

With regard to the timeline evidence, the Court of Appeal stated:

> Defense counsel did not dispute the timeline of the prosecutor but stated that it did not matter how long they were in the field because defendant was standing some distance away as a lookout and did not know Hunter was in the bed of the truck. Defense counsel portrayed the others as monsters not worrying if they lingered another 30 or 40 minutes in their efforts to try and get the last of the four rims off of the truck, knowing that a complete set was more valuable than having only the three they were able to remove.

> \*\*\*

> Rather than dwelling on the timeline, defense counsel focused on his

22

> argument that defendant was not aware of the presence of Hunter regardless of the amount of time defendant was at the scene. By arguing that the timeline was not important or critical to defendant's defense, defense counsel may have been seeking to show that the prosecution's theory of guilt was not convincing and was weak. Such a strategy would be a sound tactical decision. Defendant has failed to show that there could simply not be a satisfactory explanation for counsel's decision to not dispute the prosecution's timeline theory.

(Lodgment No. 4 at 12-14.)

With regard to the prosecutor's suggestion that Robert Cruz was afraid to testify, the Court of Appeal stated:

> [D]efense counsel had tactical reasons for failing to object. Defense counsel pointed out in his argument that the prosecution stated it was going to have Robert Cruz testify as a witness, yet failed to do so. He forcefully argued that Robert Cruz was "thick as thieves" with the other more culpable defendants. . ... Defense counsel argued that the Robert Cruz evidence was "baloney" and was offered to shore up a weak case against defendant by the prosecution.

(Lodgment No. 4 at 15.)

"Improper argument does not, per se, violate a defendant's constitutional rights." *Jeffries,* 5 F.3d at 1191 (9th Cir. 1993) citing *Darden*, 477 U.S. at 181. "Even if a prosecutor's argument is egregiously improper, a federal court cannot issue a writ of habeas corpus to state authorities unless 'the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process'." *Thompson v. Borg*, 74 F.3d 1571, 1576 (9th Cir. 1996) quoting *Darden*, 477 U.S. at 181 (internal citations omitted).

The circumstances described above do not support a finding that the prosecutor's statements infected the trial with such unfairness as to make the conviction a denial of due process. During closing arguments, the prosecutor pieced together a several hour timeline during which Hunter was carjacked, kidnapped, robbed and killed. (8 RT at 2260-2315.) In presenting the state's "theory" of the timeline, the prosecutor made reference to a variety of testimony and evidence, not just Hernandez's. (*Id.*) As the Court of Appeal noted, the evidence was not clear on the issue of timeline and was susceptible to interpretation. (Lodgment No. 4 at 13.) Although, the prosecutor misstated the time that Hernandez left his house during direct examination, he did this only twice before being corrected and then did not make the same mistake again until after the close of evidence. During

closing arguments, the prosecutor prefaced his theory of the timeline (which included the prior misstatement of when Hernandez left his house) by saying that "some of the times here can probably be subject to some argument." He also stressed that closing arguments were not considered to be "evidence" only theories, and that the jury's job was to decide the case based only on the evidence. (8 RT at 2261-62.)

Furthermore, as noted by the Court of Appeal, the absence of an objection to the prosecutor's timeline can also be attributed to a reasonable tactical decision by defense counsel. Since the timeline was not clear and may have worked against Romero, counsel stayed focused on the issue of knowledge of the victim regardless of time. Romero is thus not able to overcome the presumption that counsel's performance fell within the wide range of professional assistance. *Strickland*, 466 U.S. at 689.

Moreover, as mentioned earlier, Romero assigns a meaning to the prosecutor's statement about Robert Cruz that appears to be out of context. Defense counsel, in closing argument, asserted that Robert Cruz's statements to police implicating a knowing and active role by Romero in the felony murder were "baloney." (8 RT at 2334; 2352.) Defense counsel cast suspicion on why Robert had not been produced as a witness. (Id. at 2334.) The prosecutor stated the following in rebuttal:

> Well Robert Cruz wasn't necessary for a couple of reasons. One of them is that Jose David Romero admitted, ultimately, that he had that conversation at the K-Mart with Robert Cruz. Now, Robert Cruz, who knows he would be afraid to testify and he could be accused.

(8 RT at 2381.) Clearly the implication here is not that Robert Cruz would be afraid of Romero but of being accused and charged of an offense if he came forward to testify under oath. The prosecutor's statement was invited by or responsive to defense counsel's suggestion that the reason why Robert Cruz was not called to testify was because his statements to police were fabricated. By putting the prosecutor's statement in context the Court can readily observe that its effect on the trial as a whole was only to provide reasons for why Cruz was not a witness, not to create an image of Romero as someone of whom one should be afraid. *Darden v. Wainwright*, 477 U.S. 168, 182 (1986); *see* also *Jeffries v. Blodgett,* 5 F.3d 1180, 1192 (9th Cir. 1993) (comment was single, isolated incident of rebuttal, not an extensive tactic by prosecution).

The Court finds defense counsel's performance was not deficient and did not have a prejudicial effect on the jury's verdict. *See Strickland*, 466 U.S. at 688-89; 694. The Court of Appeal's rejection of Romero's ineffectiveness claims was not contrary to or an unreasonable application of clearly established federal law. Romero's ineffective assistance of counsel claim is **DENIED**.

C. Failure to request appropriate jury instructions

Romero argues his defense counsel failed to request jury instructions, such as for theft, that would have clearly delineated the difference between theft and robbery. (Am. Pet. at 6; Traverse at 15-19.) He contends the instructions did not inform the jury that: (1) the prosecution had to prove he was aware of the victim's presence to be guilty of any of the predicate felonies; (2) that he had to specifically intend the "force or fear" element of all the predicate felonies; and (3) that if he stole property without the force or fear element, then he only committed a theft and could not be guilty of murder in the commission of a robbery. (*Id.*)

In finding that defense counsel was not ineffective for failing to request pinpoint instructions, the Court of Appeal stated:

> Knowledge of Hunter's presence was the critical element in defendant's case; this element was covered more than adequately in the instructions given to the jury. Any alleged failure by the court in not giving a theft instruction to the jury was harmless.

(Lodgment No. 4 at 17.)

As stated earlier (in section VI), Romero has a constitutional right to have the jury find the existence of each element of a charged offense beyond a reasonable doubt. *Harmon*, 69 F.3d at 965. He is also entitled to adequate instructions on his theory of defense. *Bashor*, 730 F.2d at 1240.

The Court has already viewed the instructions as a whole to determine whether they covered all the necessary elements and Romero's theory of defense. In section VI, the Court concluded the instructions informed the jury they could only find Romero guilty if he had a specific intent to commit one of the predicate crimes against Hunter by means of force or fear; inherently, and as emphasized repeatedly by defense counsel, these instructions required knowledge of the victim. Additional instructions were not necessary and would have been an exercise in semantics rather than substantive law. Thus, defense counsel was not deficient in failing to request further or alternate instructions.

*Strickland,* 466 U.S. at 688-89.

Moreover, even assuming an error on counsel's part, Romero cannot show he suffered any prejudice as a result of the jury being deprived of additional instructions. *Id*. at 694. As outlined earlier, there was sufficient evidence to support a jury finding that Romero was aware of Hunter's presence. Thus, Romero cannot assert that the result of the verdict would have been different had additional clarifying instructions on theft and knowledge been given.

Romero's claim is **DENIED**.

## VIII.      CONCLUSION

For all the foregoing reasons, **IT IS HEREBY ORDERED** Romero's habeas petition is **DENIED** in its entirety, terminating this action.

DATED: May 26, 2009

_Janis L. Sammartino_
Honorable Janis L. Sammartino
United States District Judge